IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JANNIE LEWIS,

       Plaintiff,

                            CIVIL ACTION NO.

v.                         1:06-CV-0082-JEC

AMERICAN EXPRESS COMPANY and
AMERICAN EXPRESS LONG
TERM (LTD) BENEFIT PLAN,

       Defendants.

FILED IN CHAMBERS
U.S.D.C. Atlanta

AUG 07 2006

JAMES N. HATTEN, Clerk
By: _____
              Deputy Clerk

### O R D E R  &  O P I N I O N

This case is presently before the Court on defendants' Motion for Summary Judgment [18] and plaintiff's Cross Motion for Summary Judgment [26]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendants' Motion for Summary Judgment [18] should be **GRANTED** AND plaintiff's Cross Motion for Summary Judgment [26] should be **DENIED**.

### BACKGROUND

Plaintiff, Jannie Lewis, ("Lewis", "plaintiff") filed a complaint against American Express Company ("American Express") and American Express Long Term Disability (LTD) Benefit Plan ("the Plan") (collectively "defendants") to recover disability benefits under an employee welfare benefit plan governed by the Employee Retirement

Income Security Act of 1974 ("ERISA") 29 U.S.C. § 1001 *et seq.*
("Compl." [1].)   Plaintiff's complaint asserted that American
Express, her former employer, breached its fiduciary duties as plan
administrator because it did not make the final decision on her claim
for benefits (Count I) and that the "conduct of Defendant Plan
constitutes unlawful failure to pay benefits" (Count II).   (Compl.)

American Express employed plaintiff as a write-off analyst.
("Claim File" attach. as Ex. 4 to Def. Mot. for Sum. J. [18-1] at
432; Defendants' Statement of Material Facts Not in Dispute "DSMF"
[18-4][1] at ¶ 15.)   On May 30, 2001, plaintiff submitted a claim for
long term disability ("LTD") benefits, stating that she had first
become disabled on December 4, 2000.   (Claim File at 432.)   On this
date, American Express sponsored and maintained a plan to provide
long-term disability ("LTD") benefits to eligible employees.   (2000
Summary Plan Description "2000 SPD" attach. as Ex. 2 to Def. Mot. for
Sum. J. at 181-88.)   MetLife issued Group Policy No. 35686-G-LTD to
American Express to fund LTD benefits under the Plan.   (DSMF at ¶ 2;

---

[1]     Plaintiff failed to respond to defendants' statement of
material facts.   Pursuant to Local Rule 56.1 B.(2)a(2), the Court
deems defendants' facts admitted.   Local Rule 56.1B(2)(2) provides
that the court will deem each of the movant's facts admitted unless
the respondent "(i) directly refutes the movant's fact with concise
responses supported by specific citations to evidence...(ii) states
a valid objection to the admissibility of the movant's fact; or (iii)
points out ... or that the movant's fact is not material ... ."
Local Rule 56.1 B.(2).

AO 72A
(Rev.8/82)

Affidavit of Cindy Broadwater "Broadwater Aff." attach. as Ex. 1 to Def. Mot. for Sum. J. at ¶ 9.)

Various medical records, as well as an attending physician's statement submitted to MetLife in connection with an earlier short term disability claim, demonstrated that plaintiff had undergone mitral valve replacement in December 2000 and had been diagnosed with an occlusion in the left carotid artery and with fibromuscular dysplasia in the right carotid artery in March 2001. (Claim File at 440-48.) On her claim statement, plaintiff described her job duties as: "Review data, Analyze & Research Data." (Id. at 432.) Based on the information provided, and the 2000 Plan's definition of "total disability," MetLife approved plaintiff's claim, subject to the Plan's requirement that plaintiff provide continuing proof of her disability. (Id. at 272, 273-74.)

American Express amended the 2000 SPD, effective January 1, 2002 (prior to the final decision on plaintiff's claim), to change the process by which LTD benefits claims were to be administered. (Long Term Disability Section of 2002 Summary Plan Description "2002 SPD" attach. as Ex. 3 to Def. Mot. for Sum. J.)[2]  The Amendment delegated

---

[2]  The 2000 SPD contained the following disclaimer, under the heading "Future of the Plans": "The plans described here may be amended or terminated by the Company, through its Board of Directors, at any time without prior notice to or consent by employees." (2000 SPD at 3.)

3

"discretionary authority and fiduciary responsibility under ERISA" to MetLife "to make claim determinations and to provide a full and fair review of appealed claims including determining any final appeals of claims." (2002 SPD Administrative Information Section "Admin. Info." at 8.)   The 2002 SPD provides that the Plan Administrator has "the full authority to exercise discretion in determining eligibility and administration of the Plans." (2002 SPD Admin. Info. at 17.)   The Plan identifies the Employee Benefits Administration Committee of American Express as the Plan Administrator. (Id. at 1.)   As noted above, the Plan Administrator delegated its discretionary authority to MetLife. (Id. at 8.)   This delegation of authority also noted that "Claims fiduciaries decisions are conclusive and binding on all parties and are not subject to further review." (Id.)   The SPD further indicates that "[e]ach insurance company is responsible for the payment of all benefits offered under the plan it insures." (Id. at 8.)

On October 18, 2002, MetLife wrote to plaintiff and informed her that she no longer met the definition of disability under the American Express LTD plan as of October 18, 2002. (Claim File at 333.)   The letter further stated that the information contained in plaintiff's file established that her "physical condition has stabilized and no longer prevents [plaintiff] from working. Furthermore, the file contains limited documentation regarding your

4

psychiatric condition and its effects on your ability to work." (*Id.* at 335.)   Further elaborating on plaintiff's psychiatric condition, MetLife stated "Medical evidence illustrating how your psychiatric condition has affected your functionality was not included. Therefore, we are unable to determine that your psychiatric condition would prevent you from performing the essential duties of your occupation." (*Id.* at 334.)   MetLife also informed plaintiff of her right to appeal this decision by sending a written request for appeal to MetLife Disability. (*Id.* at 335.)

On January 21, 2003, plaintiff's attorney submitted an administrative appeal on behalf of plaintiff. (*Id.* at 244.)   Along with the appeal letter, plaintiff submitted letters from two of her treating physicians, Dr. Randy Cate ("Dr. Cate") and Dr. Gilbert R. Schorlemmer ("Dr. Schorlemmer"), as well as a job description for a Team Leader, which was the position plaintiff held at the time she stopped working. (*Id.* at 245.)   Plaintiff's January 21st letter stated that plaintiff's "job duties required a high level of responsibilities and stress her, which she is presently unable to handle due to her disabling conditions." (*Id.*)

On April 4, 2003, plaintiff sent the medical records of Diana D. Banks, M.D., ("Dr. Banks"), who treated plaintiff for eye problems, to MetLife. (*Id.* at 154-64.)   These records indicate that after testing, including an MRI, Dr. Banks found that plaintiff's

5

"visual acuity is normal" and the "etiology remains unclear." (*Id.* at 155.)   Plaintiff's attorney did not include a disability assessment from Dr. Banks. (*Id.* at 154-64.)

On March 26, 2003, MetLife informed plaintiff's attorney that it would need another forty-five days to determine whether to grant plaintiff's appeal. (*Id.* at 327.)   To help MetLife render its decision, it asked an independent psychologist, Dr. John P. Shallcross, Psy. D. ("Dr. Shallcross"), and an independent physician, Dr. Amy Hopkins, M.D., M.P.H., PhD ("Dr. Hopkins"), to review plaintiff's records. (*Id.* at 293-97; 312-13.)[3]   After reviewing plaintiff's medical records, including the opinions of the independent medical consultants, MetLife concluded that "the medical evidence fail[ed] to support restrictions or limitations of either a physical or psychiatric nature that would preclude Ms. Lewis from performing her job or occupation after October 18, 2002." (*Id.* at 298-99.)   Plaintiff was further advised that she exhausted her administrative remedies, and could pursue a civil action under Section 502(a) of the Employee Retirement Income Security Act of 1974 (*Id.* at 300.)

---

[3]   Prior to Metlife's initial decision to terminate plaintiff's LTD benefits under the Plan, MetLife requested that Dr. Mark Schroeder ("Dr. Schroeder"), an independent physician, board-certified in psychiatry, review plaintiff's medical records to determine whether plaintiff's claimed impairments were of a psychological nature. (*Id.* at 339-41; DSMF at ¶¶ 41-42.)

6

On October 25, 2005, new counsel for plaintiff wrote to MetLife and the Employee Benefits Administration Committee ("EBAC") of American Express, stating that both entities should "allow a second review of my client's appeal addressing the termination of her long term disability benefits, otherwise you will be forced to defend this matter in District Court." (*Id.* at 286.)  MetLife responded, by way of letter, on November 1, 2005, and stated that a final decision had previously been made on plaintiff's claim.  (*Id.* at 285.)  MetLife included its July 23, 2003 letter, which upheld MetLife's decision to terminate plaintiff's benefits.  (*Id.*)

Defendants filed a Motion for Summary Judgment on December 11, 2006.  Plaintiff filed a Cross Motion for Summary Judgment ("Cross Mot. for Sum. J." [26]) on January 23, 2007.  This case is now pending before the Court on defendants' and plaintiff's motions for summary judgment.

## DISCUSSION

**I.   Plaintiff's Claim Regarding the Denial of Benefits Under ERISA**

**A.  ERISA Standard of Review**

ERISA provides no standard for reviewing decisions of plan administrators or fiduciaries.  *Williams v. BellSouth Telecomm., Inc.*, 373 F.3d 1132, 1134 (11th Cir. 2004) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 (1989)).  However, in

AO 72A
(Rev.8/82)

*Firestone*, the Supreme Court established a standard for reviewing administrators' plans decisions, which standard set out differing levels of scrutiny, depending on the amount of discretion accorded to the administrator.  Specifically, "(1) *de novo* where the plan does not grant the administrator discretion [*i.e.*, does not exercise discretion in deciding claims;] (2) arbitrary and capricious [where] the plan grants the administrator [such] discretion; and (3) heightened arbitrary and capricious where [the plan grants the administrator such discretion but] ... [he has] ... a conflict of interest." (*Id.* at 1134.) (internal quotation and citation omitted).[4]

Here, MetLife had discretion[5] to make benefits decisions, which

---

[4]     The *Williams* court indicated that even though *Firestone* addressed the standard for judicial review of an administrator's plan interpretations, and not factual determinations (*i.e.*, whether an individual is disabled under the plan because he is completely unable to work), courts have read *Firestone* broadly and apply the three-level review to both plan interpretations and factual determinations.

[5]     The 2002 SPD specifically states that:

American Express has delegated to certain claims administrators the discretionary authority and fiduciary responsibility under ERISA to make claim determinations and to provide a full and fair review of appealed claims including determining any final appeals of claims...Claims fiduciaries' duties include the discretionary authority and fiduciary responsibility under ERISA to determine:

- What constitutes a benefit and what constitutes a claim under the applicable plan
- Utilization review that results in concurrent or prospective approval or denial of benefits...

8

would trigger an arbitrary and capricious standard, but defendant concedes that the more onerous "heightened" arbitrary and capricious standard applies "because benefits are paid from MetLife's funds." (Def. Mot. for Summ. J. [18] at 18.) *See Williams*, 373 F.3d at 1135 ("in most cases where a company both administers and funds a plan, a conflict of interest arises, thus triggering heightened arbitrary and capricious review.") (internal citations omitted); *Levinson v. Reliance Standard Ins. Co.*, 245 F.3d 1321, 1325-26 (11th Cir. 2001) (where plan administrator of ERISA benefits plan pays participants out of its own assets, a conflict of interest exists between its fiduciary rule and its profit-making role, and, thus, a heightened arbitrary and capricious standard applies when the court reviews the administrator's denial of benefits under the plan).[6]

---

Claims fiduciaries decisions are conclusive and binding on all parties and are not subject to further review. (2002 SPD Admin Info at 8.)

[6] Courts that have considered the issue have given effect to language of discretion appearing in the version of the Plan in effect when the benefits determination at issue was reached because it relates procedurally to how claims are handled, rather than to a claimant's substantive right to benefits. *See Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health and Welfare Plan*, 298 F.3d 191, 196-197 (3rd Cir. 2002); *Hackett v. Xerox Corp. Long-Term Disability Income Plan*, 315 F.3d 771, 774 (7th Cir. 2003); *Grosz-Salomon v. Paul Revere Life Ins. Co.*, 237 F.3d 1154, 1160-1161 (9th Cir. 2001); *Agin v. Liberty Life Assurance Co. of Boston*, 2006 WL 1722228, *10 (W.D. Mich. June 21, 2006); *contra Gibbs ex. rel. Estate of Gibbs v. CIGNA Corp.*, 440 F.3d 571, 576 (2d Cir. 2006). Here, the 2002 summary plan description in effect when MetLife rendered its

In the Eleventh Circuit, when a court reviews a benefits-denial decision under the heightened arbitrary and capricious standard, it proceeds in essentially three steps.  First, the court engages in a *de novo* review to determine whether the decision to deny benefits is "wrong" (*i.e.*, the Court disagrees with the decision); if it is not "wrong" the inquiry ends, and the administrator prevails.  *Williams*, 373 F.3d at 1138 (internal citation omitted).  If the court finds that the decision was "wrong" it proceeds to the second step and determines whether the decision was nevertheless "reasonable."  (*Id.*) (internal citation omitted.)  A decision is considered reasonable if "there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." *Jett v. Blue Cross and Blue Shield of Ala., Inc.*, 890 F. 2d 1137, 1139 (11th Cir. 1989) (internal citations omitted).  If the decision is considered both "wrong" and not reasonable, the claimant prevails. However, if the decision is "wrong" and reasonable, the court must proceed to a third step.  If the court reviews the decision under the arbitrary and capricious standard, deference is accorded to the administrator's decision.  (*Id.* at 1137.)  However, if the heightened arbitrary and capricious standard applies the court must apply a level of deference that is somewhere between what is applied under

---

decision granted MetLife discretionary authority.

10

the *de novo* and "regular" arbitrary and capricious standards.  (*Id.*)

The Eleventh Circuit has held that for decisions regarding plan interpretation, a burden-shifting analysis is used to determine whether a claim administrator's decision survives the heightened arbitrary and capricious review.  *See Brown v. Blue Cross and Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1566-67 (11th Cir. 1990) ("we hold that when a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest.")  The Eleventh Circuit has held that the heightened arbitrary and capricious standard applies to factual determinations, as well as plan interpretations.  However, the Eleventh Circuit recently questioned whether *Brown's* burden-shifting analysis would apply in a factual determination case.  *Williams*, 373 F.3d at 1138-39.  The *Williams* court did not provide an alternate formulation, and stated that it would leave the decision as to whether the burden-shifting analysis articulated in *Brown* applies to factual determinations for "another day."  (*Id.* at 1139.)

Since the *Williams* decision, courts within the Eleventh Circuit have grappled with the appropriate level of review for factual determinations where a plan grants discretion, but there is a conflict of interest.  Following the logic in *Wise v. Hartford Life*

11

*and Accident Ins. Co.*, 360 F. Supp. 2d 1310 (Story, J., N.D. Ga. 2005), the Court holds that a conflicted administrator can carry its burden under the heightened arbitrary and capricious standard if it can demonstrate that the opinions and evidence it relied on, from a qualitative and quantitative perspective, were at least as objectively reliable as the countervailing opinions and evidence before it. (*Id.* at 1323.)

**B.    Application of the Heightened Arbitrary and Capricious Standard of Review Regarding the Claims Administrator's Decision to Deny Benefits**

As noted above, the Court will apply the heightened arbitrary and capricious standard of review to the Administrator's decision. The first step of this analysis requires the Court to apply the *de novo* standard to determine whether the claim administrator's benefits-denial was "wrong" (*i.e.*, the court disagrees with the administrator's decision). *Tippitt v. Reliance Standard Life Ins. Co.*, 457 F.3d 1227, 1232 (11th Cir. 2006) (internal citation omitted); *Williams*, 373 F.3d. 1138.

In making its benefits-denial decision, MetLife reviewed the medical records of several doctors, including plaintiff's own treating doctors, as well as two independent physicians. These records do not indicate that plaintiff was completely incapable of working.

Specifically, medical records indicate that plaintiff had

12

undergone mitral valve replacement in December 2000, anticoagulation, peripheral vascular disease, carotid occlusion, right carotid angioplasty and cholelithiasis. (Claim File at 346.) Dr. Cate filled out an Attending Physician Statement of Disability on or about April 2002. In this form, Dr. Cate indicated that plaintiff was expected to fully recover at an indeterminate date. (Claim File at 402.) Under the "Psychological Functions" section of the form, Dr. Cate assigned plaintiff to "Class 3 - Patient is able to engage in only limited stress situations and engage in only limited interpersonal relations (moderate limitations)". (*Id.*) Under the heading "Physical Capabilities," Dr. Cate indicated that plaintiff could sit for 8 hours intermittently, stand for 4 hours intermittently, and walk for 4 hours intermittently. (*Id.* at 403.) Dr. Cate also reported that plaintiff could climb, twist/bend/stoop, reach above shoulder level, and operate a motor vehicle. (*Id.*) Plaintiff had the ability with both hands to perform fine finger movements, eye/hand movements, and pushing/pulling. (*Id.*) Under the cardiac functional capacity section, Dr. Cate placed plaintiff at Class 2 (Slight Limitation). (*Id.*)

By the Spring of 2002, plaintiff's medical records indicate that her symptoms stemmed not from a physiological cause, but from anxiety. In March of 2002, plaintiff's primary physician, Dr. Cate, noted that he thought plaintiff's symptoms were "anxiety related and

13

seem to be improving with low dose Paxil." (*Id.* at 391.) Dr. Cate also stated that "Jannie [plaintiff] returns for F/U [follow-up] of depression with GAD [generalized anxiety disorder]. She's had a number of visits recently for atypical sx [symptoms] including HA's [headaches], chest pain which ultimately I believed were secondary to anxiety. She tended to agree with me and we began a trial of Paxil last month." (*Id.* at 390.) On April 10, 2002, Dr. Cate wrote, "Since last visit [plaintiff] was denied for disability with her CV [cardio-vascular] surgeon declining to fill out the disability form. It was then sent to me and I filled it out indicating that other than her current psychological problems I don't think she has any disability that prevent her from working. Her visual sx that she was having previously have substantially diminished and she reports only 1 episode in the last month." (Claim File at 386.)

On May 9, 2002, Dr. Cate indicated that plaintiff visited for a follow-up for her generalized anxiety disorder ("GAD"), and depression. According to Dr. Cate's notes, plaintiff had "multiple sx of depression and an anxiety but unfortunately hasn't tolerated Effexor very well...She continues to have eye sx with temporary loss of vision but quite brief and clearly reduced frequency since she's been on antidepressants." (*Id.* at 346.) Then, on June 20, 2002, Dr. Cate noted that "At last visit [plaintiff] seemed to begin developing increased insight into her sx's being potentially caused by

14

AO 72A
(Rev.8/82)

anxiety...Her valve seems to be functioning completely normally."
(*Id.* at 349.)

Based on the diagnosis and reports filed by Dr. Cate that
plaintiff's symptoms were related to her anxiety, MetLife requested
information from Dr. Cate concerning any restrictions and limitations
resulting from plaintiff's anxiety.   Dr. Cate provided no such
information.

MetLife then had plaintiff's medical records reviewed by an
independent physician, Dr. Shallcross, who was board-certified in
psychology, and by Dr. Hopkins, an independent physician who was
board-certified in internal medicine.[7]  (Claim File 294-297; 312-313.)
After analyzing plaintiff's records, the independent physicians found
that it was not apparent that plaintiff's medical conditions
precluded her from all work activity.  (Claim File at 312-331; 293.)
Dr. Shallcross wrote, as follows:

> Based upon the medical received subsequent to the
> last date paid of 10/18/02, it is not apparent

———————————

[7]  MetLife also had plaintiff's medical records reviewed by an
independent physician, Dr. Schroeder, who was board-certified in
psychiatry before making its initial decision to terminate
plaintiff's benefits. (Claim File at 339-41.)  Dr. Schroeder opined
that Dr. Cate's conclusion that plaintiff suffers from generalized
anxiety disorder and depression is not inconsistent with the reported
symptoms.  (Claim File at 341.)  Dr. Schroeder also noted that
"[a]lthough the employee has had a history of a number of serious
medical and surgical problems, the medical record does not support
that these are causing her significant problems at this time."  (*Id.*)

that the claimant is precluded from all work activity on mental and nervous grounds....There are no restrictions or limitations given by Dr. Cate nor is there any general description of functional impairments...It is far more customary for a claimant, precluded from all work capacity due to a mental and nervous condition, to be referred for psychotherapy in addition to medication management. It would also usually be recommended that a claimant be referred for a Psychiatric Consult if her condition was deemed to be primarily psychological/psychiatric in nature. As noted above, no referral to any mental health practitioner has apparently been made. (*Id.* at 312-313.)

Dr. Hopkins wrote, as follows:

EE's [employee/plaintiff] VA [visual acuity] was 20/20 in 5/01, and there was no subsequent evidence of any visual worsening. Therefore, there is not objective support in this record for any physical impairment based on EE's vision or any other sx. EE's cardiac status has been stable since her MVR [mitral valve replacement]. I cannot comment on whether or not EE's anxiety was disabling, but her treating physician did not feel that EE was physically disabled, and I concur... No physical impairment was objectively documented which would have precluded EE from RTW, FT [return to work, full time], own occupation, no restrictions or limitations, after 10/18/02. (Claim File at 293.)

On March 13, 2002, Plaintiff's cardiologist, Dr. Schorlemmer, noted that plaintiff had been having some chest wall and visual disturbances, but, that the "[r]ecent carotid Doppler was unremarkable" and that her "[c]ardiac work-up is still unremarkable, as it has been in the past." (Claim File at 393.) At this time, Dr. Schorlemmer put plaintiff on a yearly follow-up plan. (*Id.*)

16

It is well-established that a participant challenging an administrator's denial of benefits under ERISA bears the burden of showing that he is entitled to contractual benefits. *Richards v. Hartford Life & Accident Ins. Co.*, 153 Fed. Appx. 694, 696 (11th Cir. 2005) (internal citation omitted). Here, plaintiff is unable to establish her eligibility for benefits under the Plan. The above medical records and opinions indicate that plaintiff did not suffer from any physical impairment that precluded her from returning to work. Even though Dr. Cate found that plaintiff had some limited functional capacity, neither he nor any of plaintiff's other doctors provided a detailed assessment of plaintiff's ability to perform her job-related tasks. The 2000 Plan[8] defines "total disability" as follows:

> You are considered totally disabled and eligible to apply for LTD Benefit Plan benefits if, during the six-month waiting period and the first two years that benefits are payable, you are unable to perform any and every duty of your own occupation due to a medically determined physical or mental impairment caused by sickness, disease, injury or pregnancy. You must require the regular care and attendance of a doctor. (2000 SPD at 185.)

In addition, the 2000 Plan states that an individual "would be

---

[8] The substantive provisions of the 2000 Plan, in effect at the time plaintiff's claims were filed, govern. In any event, the 2002 Plan definition of "total disability" is similar to the 2000 Plan definition in all material respects.

17

considered totally disabled...if you are unable to perform all of the material duties of your job on a full-time basis, but are performing at least one of the material duties of the job or any other gainful work on a part-time or full-time basis..."   (*Id.*)

Without any indication from plaintiff's doctors that she was unable to perform her job-related tasks, the Court can identify no reason to conclude that MetLife's benefits decision was improper. *See Mason v. Hartford Life & Accident Ins. Co.*, Civ. A. No. 02-10067, 2004 WL 2674352, *5 (S.D. Fla. Aug. 31, 2004) ("While all of [plaintiff's] physicians indicated that [plaintiff] was severely limited in functional capacity and 'incapable of (minimal) sedentary activity.' [sic] none provided a detailed assessment of her ability to perform work-related tasks.   Without specific information about [plaintiff's] functional capacity, Hartford had no basis to conclude that her disabilities rendered her "totally disabled" within the meaning of the Plan.'")

Plaintiff, however, argues that Dr. Cate's November 1, 2002 letter establishes that she suffered from a disability, which precluded her from re-entering the workforce.  Dr. Cate stated,

> As time has progressed I have become convinced that [plaintiff's] current symptoms are functional but I think directly related to and brought on by her very real mitral valve disease and carotid disease.  It's my believe [sic] that with proper treatment of [plaintiff's] anxiety disorder and time that she will be able to re-enter the work

18

> force.   However at this point I do believe she is
> disabled."   (*Id.* at 247.)

The Court finds this letter insufficient to demonstrate that plaintiff was totally disabled.   *See Muzyka v. Unum Life Ins. Co. of Am.*, 195 Fed. Appx. 904, 909 (11th Cir. 2006) (administrator's decision was not *de novo* "wrong" where "[t]here was no evidence, other than conclusory and at times inconsistent statements by [plaintiff's] treating physician based on self-reporting, to document any decrease in functional capacity.")

Furthermore, this Court may not give special weight to the opinions of treating physicians.   *Shaw v. Connecticut General Life Ins. Co.*, 353 F.3d 1276, 1286-87 (11th Cir. 2003) (though administrators may not refuse to arbitrarily credit the opinion of a treating physician, courts cannot require administrators to give special weight to the opinion of a claimant's treating physician, nor may a court impose on plan administrators the burden of explaining why they credited reliable evidence that conflicts with a treating physician's evaluation. (internal quotation and citation omitted).

Plaintiff also claims that MetLife "did not take into consideration all of the evidence of the Social Security 'Fully Favorable Decision.' (Cross Mot. for Sum. J. at 1-2.) The Court finds that MetLife's decision was correct despite the Social Security Administration's differing conclusion.   The Eleventh Circuit has

19

noted that the approval of disability benefits by the Social Security Administration is not dispositive as to whether a claimant satisfies the requirement for disability under an ERISA-covered plan. *See Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1314, ftn. 8 (11th Cir. 1999) (internal citation omitted). However, a district court may consider the Social Security Administration's determination of disability when reviewing a plan administrator's benefit decision. (*Id.*) (internal citation and quotation omitted.) In addition, the Supreme Court explained that there are "critical differences between the Social Security disability program and ERISA benefit plans." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832 (2003). "In determining entitlement to Social Security benefits, the adjudicator measures the claimant's condition against a uniform set of federal criteria." (*Id.* at 823.) Furthermore, unlike the social security decision-maker, the plan administrator is under no obligation to defer to the treating physician's opinion. (*Id.* at 822-23) (rejecting treating physician rule in ERISA cases.) Thus, the Court does not find that MetLife reached an incorrect conclusion regarding plaintiff's disability because the Social Security Administration reached a different conclusion.

In the alternative, even if MetLife's decision was "wrong," the Court finds that MetLife's decision was reasonable, and based on objectively reliable information. Here, MetLife relied on the

AO 72A
(Rev.8/82)

opinion of three independent medical consultants, as well as the records of plaintiff's treating physicians. *See Richards*, 153 Fed. Appx. at 697 (11th Cir. 2005) (even if Court concluded that administrator's decision was *de novo* wrong, under the heightened arbitrary and capricious standard, the court could not find that the administrator abused its discretion by relying on the independent reviewing physician's opinion that plaintiff was capable of returning to work).   Plaintiff relies, almost entirely, on the conclusory opinion of Dr. Cates in a November 1, 2001 letter to support her claim.   The Court finds that MetLife based its decision on evidence that was both qualitatively and quantitatively as, or more, reliable than plaintiff's evidence. Accordingly, the Court grants defendants' motion for summary judgment on Count II.

## II.   **Plaintiff's Claim for Breach of Fiduciary Duty**

Count I of plaintiff's complaint seeks recovery against American Express for breach of fiduciary duty.   Plaintiff specifically contends that American Express failed to abide by its obligation under the Plan to review plaintiff's appeal for denial of her benefits.

Plaintiff cannot establish that American Express owed her any duty to review her claim for benefits.   The SPD in effect at the time plaintiff's claim was denied delegated final decision-making authority regarding long-term disability decisions with MetLife.

21

(2002 SPD Admin. Info. at 8 "Claims fiduciaries decisions are conclusive and binding on all parties and are not subject to further review.")    Accordingly, American Express did not have any duty to review MetLife's benefits decision.[9]

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** defendants' Motion for Summary Judgment [18] AND **DENIES** plaintiff's Cross Motion for Summary Judgment [26].

SO ORDERED, this ___/7___ day of August, 2007.

_____
JULIE E. CARNES
UNITED STATES DISTRICT JUDGE

---

[9]  To the extent plaintiff seeks to bring an action under Section 503(a) of ERISA, the Court finds that such a claim is barred under the principles established in *Varity Corp. v. Howe*, 516 U.S. 489 (1996).  In *Varity*, the Supreme Court held that when ERISA provides an adequate remedy "there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" (*Id.* at 515.)  The Eleventh Circuit has noted that ERISA plan participants who can seek relief under § 1132(a)(1)(B), cannot also seek relief under § 1132(a)(3).  *Ogden v. Blue Bell Creameries U.S.A., Inc.*, 348 F.3d 1284, 1286-87 (11th Cir. 2003); *Katz v. Comprehensive Plan of Group Ins.*, 197 F.3d 1084, 1089-90 (11th Cir. 1999).  Accordingly, if plaintiff is seeking relief under § 1132(a)(3), this claim is barred because plaintiff could have asserted a cognizable claim under § 1132(a)(1)(B) against MetLife.

AO 72A
(Rev.8/82)